

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

KIA THOMAS and JEROME PITTS, SR., :
as guardians *ad litem* for JP, a minor :
                               :

           Plaintiff,      :

                               :

          v.                :     Civ. No. 08-205-LPS

                               :

THE BOARD OF EDUCATION     :
OF THE BRANDYWINE SCHOOL     :
SCHOOL DISTRICT and DR.        :
BRUCE HARTER               :

                               :

           Defendants.    :

## OPINION

Thomas C. Crumplar, Robert Jacobs, JACOBS & CRUMPLAR, P.A., Wilmington, DE; Reanne Warner, Thomas S. Neuberger, THE NEUBERGER FIRM, P.A., Wilmington, DE, Attorneys for Plaintiff.

David H. Williams, James H. McMackin III, Allyson M. Britton, MORRIS JAMES, LLP, Wilmington, DE, Attorneys for Defendants.

December 30, 2010
Wilmington, Delaware

Stark, U.S. District Judge:

# I.    INTRODUCTION

This federal civil rights action presents the question of whether the Brandywine School District School Board and Superintendent maintained a custom or policy of deliberate indifference that permitted one of its teachers to violate the constitutional rights of one of its students. It also poses the issue of whether the Superintendent knew of or acquiesced in the teacher's conduct. Finally, even if the record does not justify proceeding to trial on the plaintiff's federal cause of action, the Court must consider whether to exercise supplemental jurisdiction over the plaintiff's state law claims.

Pending before the Court is the motion for summary judgment filed by the defendants, seeking judgment on all counts. (D.I. 69)  For the reasons described below, the Court will grant this motion in part and deny it in part.

# II.    FACTUAL BACKGROUND

The nature of this case necessitates devoting substantial space to laying out the facts, as they appear from the record, taken in the light most favorable to the plaintiff (as the non-moving party).

Plaintiff is JP, a minor, who at the times pertinent to this suit was a student at Claymont Elementary School ("Claymont") in the Brandywine School District ("District"). JP is a male. This suit was filed by Kia Thomas and Jerome Pitts, Sr. as guardians *ad litem* for JP ("Plaintiff").

In 2002, Defendant Brandywine School District hired Defendant Rachel Holt ("Holt"), a

1

female, to teach in the District. (D.I. 70 at 15)[1] Holt had previously worked for five years outside the District in various schools in and around Wilmington, Delaware.[2] Pursuant to District policy, the District had conducted a criminal background check on Holt before offering her a teaching position, and that check revealed no prior criminal activity. (D.I. 71 at A91-92)

During the 2003-04 academic year, Holt was assigned to teach sixth grade at Claymont, an elementary school within the District. (D.I. 71 at A93) Claymont's principal was Betty Pinchin, and the assistant principal was George Thompson. Holt's evaluations in 2003-04 were mostly "exemplary" and "effective." (*Id.* at A94-95) Her evaluations specifically indicated, however, that she needed to establish "a plan for more effective behavior management at the onset of the new school year." (*Id.*)

The following year, 2004-05, Holt received less positive evaluations. Assistant Principal Thompson determined that "[n]egative interactions with students need[] to be closely monitored and avoided at all cost. . . . Ms. Holt needs to work hard at toning down the rhetoric used to address all students in class and around the building." (*Id.* at A96-97) Thompson's concerns appear to have centered on encouraging Holt to approach students in a "more positive and non-confrontational manner." (*Id.*)

In the 2005-06 school year, Plaintiff JP was a student in one of Defendant Holt's sixth grade science classes. (D.I. 77 at B327) At the beginning of the 2005-06 school year, Holt was

---

[1]Defendant Holt has not moved for summary judgment. Accordingly, nothing in this Opinion addresses Holt's potential liability.

[2]Holt received her teaching certificate in 1997. During the years before she accepted employment with Brandywine, Holt taught at Marion T. Academy, Ursuline Academy, and Christ Our King. (*See, e.g.,* D.I. 71 at A87-89)

placed on an individual "progressive improvement plan," in which Holt was to receive more

classroom observations and was expected to do outside reading on improving her teaching

methods. (*Id.* at A98-99) Progressive discipline is the regular process that the District uses when

disciplining its teachers. (*Id.* at A71-77) Pursuant to Holt's individualized plan, Thompson and

Pinchin observed Holt in her classroom, in October and December 2005, respectively. Both

Pinchin and Thompson recognized positive aspects of Holt's performance, but also noted that

Holt needed to be careful to be more sensitive because she might come across as too harsh to

students sometimes. (*Id.* at A104-08)

At least as early as January 2006, Principal Pinchin began to receive complaints from

parents about Holt's behavior. Pinchin and Thompson met with Holt on January 11, 2006. On

January 20, 2006, Thompson sent Holt a follow-up email "concerning issues that were discussed

during our meeting on January 11, 2006." (D.I. 77 at B177) Specifically, Thompson's email

stated:

> The following are issues regarding classroom and hallway observations that
> were addressed.
>
> **\* Hip-hop music during class time.**
>
> **\* Internet car search during class time.**
>
> **\* Students not assigned to your class spending to[o] much time in
> your classroom.**
>
> **\* Giving your ok for your 6th grade students to push other 4th grade
> students out of the way during lunch switch.**
>
> Please be advised that this documentation is also a request that you make
> the necessary changes to address the above issues.

(*Id.*) (emphasis in original)

3

Pinchin and Thompson met with Holt again on January 20, 2006, this time to discuss reports that Holt was taking some students home in her personal vehicle. (D.I. 77 at B179) At this meeting, Pinchin and Thompson expressly instructed Holt not to drive students home anymore. *(Id.)*

On January 21, 2006, Pinchin received a parental complaint about Holt, which Pinchin documented. *(Id.* at B178) In a note Pinchin wrote that same day, she listed "Parent Concerns" regarding Holt:

> Instant messaging kids 10:00 at night
>
> Becoming more of a buddy tha[n] teacher – uncomfortable with situation
>
> No homework.  Doesn't believe in H.W.
>
> I'm part of "cool" group not "Geeks"
>
> Grades aren't important.

(D.I. 71 at A110; D.I. 76 at B123)

On January 27, Pinchin received a complaint from another parent that also focused on classroom instructional behavior. (D.I. 71 at A111) Pinchin and Thompson then learned that Holt had disobeyed their orders to stop driving students home. This prompted Thompson, on January 30, 2006, to issue Holt a "written notice and final request to cease this practice" of driving students home. (D.I. 71 at A113) In an email to Holt that same day, Thompson wrote:

> On January 20, 2006 we briefly spoke to discuss reports of you taking students home in your car.  My self and Mrs. Pinchin cautioned you about the liability of taking any students home especially those of the opposite sex.
>
> At that time you stated that it was only [non-Plaintiff D.] and it was with

4

parent permission. At the conclusion of the meeting it was established that you would discontinue this practice. It has come to our attention that you are continuing to take students home[] in your personal vehicle.

**Please be advised that this is a written notice and final request to cease this practice.**

(*Id.*) (emphasis in original)

Meanwhile, sometime between late December 2005 and early February 2006, students began to report to the guidance counselor, Mary Ann Giannotti, that there was "monkey business" going on in Holt's classroom. Much of the behavioral concerns that Counselor Giannotti and Principal Pinchin learned of at this time were from "the academic standpoint and the professional standpoint," such as "phones being taken out in class, radios being turned on to music stations like Q102 . . . kids were dancing on tables, standing up on chairs, not enough learning going on." (D.I. 77 at B37-39) While Giannotti first recalls being informed of some of this inappropriate behavior in late-December of 2005 or early January of 2006, Giannotti only first reported these student complaints to Pinchin sometime in January or February 2006. (*Id.*) On February 1, 2006, Giannotti sent Pinchin an email describing, among other things, reports of Holt disparaging certain students, allowing students to yell and curse in class, creating nicknames for students, and not enforcing the school's dress code.[3] (D.I. 71 at A115-16)

While most of the complaints about Holt's conduct through late January were about classroom management (with the notable exceptions of the late-night instant messaging and driving students home after school), sometime around February 2006, accounts of Holt's behavior

---

[3]In her February 1, 2006 email to Pinchin, Giannotti also noted that Holt had indicated that she could not be fired and that she was unconcerned with the administration's instruction to stop transporting children in her personal vehicle. (D.I. 71 at A116)

got "progressively worse." (D.I. 77 at B39)  This is reflected, for example, in Giannotti's

February 1 email to Pinchin, in which Giannotti relayed that one student reported that, "Ms. Holt

favors a select few [number] of boys and even sits on their lap.  She [the student] has seen Ms.

Holt kiss [two students] on the face."  (D.I. 71 at A115)  In that same email, Giannotti mentioned

that another student "[h]as concerns that Ms. Holt is weird with her kids and the boys pull her

onto their laps. . .  The boys boss her around like she is their girlfriend, and she listens. . . ."  (*Id.*)

The February 1, 2006 email also states: "Ms. Holt took [Plaintiff] to McDonald's for his

birthday . . . [Another student] asked to go to McDonald's and Ms. Holt replied, 'It's my baby's

birthday.'"  (*Id.*)  Another student witnessed Holt "many times sitting on [Plaintiff's] lap and

kissing him on the cheek."  (D.I. 77 at B188)  Another student's parent also indicated that Holt

was seen spending time with her students on a Friday night at the skating rink.[4]  This same parent

indicated that she was upset that Holt was "wanting to hang around [her daughter] and trying to

be [her daughter's] friend."  (*Id.* at B42)

During this time, Pinchin reported some of these behaviors to the District's Director of

Human Resources, Debbie Bullock.  The disciplinary process at the District follows a procedure

that attempts to comport with state law as well as adhere to the contractual obligations contained

in the collective bargaining agreement between the District and the teachers' union, all while

protecting students' rights.  Typically, the District's disciplinary process starts with a documented

meeting, which is "like a warning." (D.I. 77 at B118)  If the meeting does not correct the

problems, the next step is a cautionary letter and involvement of the District's Human Resources

---

[4]The record is not clear about the exact timing of when Pinchin or Giannotti received this
specific report.  (D.I. 71 at A118)

Department.  If the behavior still continues, the next steps are more serious and include suspension

and possible termination.  (*Id.*)

As Pinchin continued to receive complaints about Holt in February 2006, eventually

Pinchin scheduled a meeting with Bullock.  On February 15, 2006, Pinchin and Bullock met with

Holt.  (*Id.* at B183)  The next day, February 16, 2006, the District issued Holt a cautionary letter.

(*Id.*)  That letter reads as follows:

> The Brandywine School District expects its employees to conduct
> themselves appropriately at all times and when necessary, assists them in
> understanding what types of conduct are considered to be unacceptable and take
> corrective action.
>
> During our meeting with Dr. Bullock, Director of Human Resources on
> Wednesday, February 15, 2006, we discussed your insubordination and
> unacceptable conduct with your students in the classroom.  Specifically, we
> addressed instant messaging and casual telephone conversations with students after
> school hours; taking them home in your private vehicle without proper
> authorization; not supporting academic and behavioral expectations; and showing
> favoritism to select students
>
> While developing and maintaining positive working relationships with your
> students is critical to their success, it should be noted that there are limitations to
> mitigate the District's legal risks.  Therefore, you are expected to conduct yourself
> professionally at all times to promote fairness and equity among your students and
> address student behaviors in a way that is consistent with established protocol.
> Furthermore, you are directed to refrain from making inappropriate comments
> about students to other students and adhere to all District policies, particularly as it
> relates to transporting students in your private vehicle.
>
> It should be noted that failure to comply with the aforementioned directives
> may result in progressive disciplinary action, up to and including termination of
> your employment.  I will be monitoring your conduct in this regard and meet with
> you regularly or on an as-needed basis to provide you with feedback and support.

(*Id.*)

On March 1, 2006, both a parent volunteer and the school librarian witnessed Holt give "a

7

loud kiss" to one of her male students (not the Plaintiff) in the Claymont library. (*Id.* at B184)
The librarian suggested to Pinchin that "[Holt] seemed to be doing this in jest, but it was loud
enough to be heard throughout the class." (*Id.*) The librarian also informed Pinchin that Holt
sometimes called "the boys" "boo" or "my boo" as she lined them up in the hallways. (*Id.*)
Additionally, the librarian told Pinchin that Holt had "promoted a hugging issue," after apparently
having "made a bet" with a female student that the student "couldn't go a certain amount of time
without hugging boys. The time was apparently up. Rachel [Holt] said 'OK'" and, thereafter, the
female student grabbed two boys and hugged them and was headed for a third boy before Holt
said, "'Save it.'" (*Id.*)

Pinchin forwarded the librarian's email to Bullock the next day, March 2, indicating that
both the parent and the librarian had spoken to Pinchin about Holt's behavior and asking Bullock
to, "Please advise." (*Id.*) Also on March 2, Holt emailed Bullock (copying Pinchin) to inform her
of the kissing incident. In an email Holt entitled, "I need help!!!!!," Holt explained to Bullock that
when she was picking up her students from the library, Holt noticed "what a great job they were
doing." (*Id.* at B190) She went over to the male student (not the Plaintiff) and "said great job and
hugged him and with out even thinking gave him a quick kiss on the cheek." (*Id.*) In Holt's
words, she "didn't even realize" that she had kissed him, adding, "I know it was wrong. I feel
really terrible." (*Id.*) As further explanation, Holt wrote: "If you knew [the student,] keeping him
quite [sic] for any length of time is an accomplishment. I was only rewarding him for a job well
done. I also hugged others too. My room is a little difficult to keep on task. So I was rewarding
them." (*Id.*) Holt also wrote, "I have stopped totally all of the things we discussed at our meeting.
I no longer talk on the computer or phone with any of my students." (*Id.*) She added:

8

> I have been doing an awesome job and have worked really hard trying to change being me. I'm not making any excuses, I was wrong and I'm sorry. Please take into consideration all the progress I have made since our meeting before you take any action. Betty [Pinchin] will be calling you and letting you know the story but I wanted to let you know first.

(*Id.*)

Still on March 2, Pinchin visited Holt's room to set up a meeting with her for after school. (D.I. 77 at B191) When Pinchin went up to Holt's room, she found Holt "sitting along side" the male student, J, whom Holt had admitted to hugging and kissing in the library the day before. (*Id.*) Pinchin wrote to Bullock: "When questioned about this she [Holt] told me that that was the only way she could keep him seated. [J] is also one of the boys she was taking home. Will wait to hear from you." (*Id.*)

On March 10, 2006, the District suspended Holt for three days. (*Id.* at B192) Pinchin's letter informing Holt of the suspension reads as follows:

> The Brandywine School District ("District") expects its employees to conduct themselves appropriately at all times and when necessary, assists them in understanding what types of conduct are considered to be unacceptable and take corrective action.
>
> During our meeting with Dr. Bullock, Director of Human Resources on Wednesday, February 15, 2006, we discussed your insubordination and unacceptable conduct with your students and in the classroom. On Wednesday, March 1, 2006, it was brought to my attention that you hugged and kissed a student in the library, which was witnessed by a parent volunteer. Furthermore, you have failed to adhere to a specific directive as such misconduct could present liability issues for the District.
>
> While developing and maintaining positive working relationships with your students is critical to their success, it should be noted that such misconduct places the District at legal risk and will no longer be tolerated. Therefore, you are suspended without pay for three (3) days: Monday through Wednesday, March 13,

14 and 15, 2006. Upon your return to work on Thursday, March 16, 2006, you are expected to conduct yourself professionally and appropriate[ly] at all times and promote fairness and equity among your students, particularly by refraining from affectionate touching and/or gestures with students. Future misconduct of the same or similar nature will result in further disciplinary action, up to and including termination of your employment.

(*Id.*) Thompson testified that he and Pinchin thought that three days was not a sufficient amount of time for Holt's suspension, but Bullock was the one who determined the length of the suspension. (D.I. 76 at 13; D.I. 77 at B216)

After serving her suspension, Holt returned to work on March 16, 2006. (D.I. 77 at B300) Over the course of the following week, March 24 through March 31, Holt engaged in sexual intercourse with Plaintiff, who was one of her sixth grade students, numerous times. (*Id.* at B64; *Id.* at B327) Holt was arrested on April 4, 2006 and charged with multiple counts of rape and supplying alcohol to a minor. (D.I. 70 at 19; D.I. 76 at 15) Holt also allowed one of Plaintiff's friends to watch the two of them having sex. (D.I. 77 at B7) Holt eventually pled guilty and is now serving an extended jail sentence. (D.I. 78 at B858)[5]

Counselor Giannotti, who was "probably the closest one to Ms. Holt in the school," has testified in the course of this lawsuit that she had not thought that any of the behavior that she had observed Holt engage in had been sexually inappropriate: "Did I ever say that she was acting sexually inappropriate . . . No. I never said sexually. I said inappropriate." (D.I. 77 at B60) Pinchin testified that after she had put into a place a system in which she would meet with Holt

---

[5]Six days after her arrest, on April 10, 2006, the District's H.R. Director, Bullock, sent Holt a letter notifying Holt she had been suspended and that a "recommendation to terminate your employment for immorality and misconduct in office will be presented to the Board of Education." (D.I. 71 at A137) It appears that Holt's termination became effective 30 days after the Board's meeting on April 17, 2006. (*Id.* at A138)

weekly to more closely monitor her classroom performance, and after her suspension, Holt stopped sitting on students' laps.  (*Id.* at B126)  Pinchin testified: "no one observed her nor was it reported that that was continuing to go on."  (*Id.*)  When asked about whether Pinchin had suspected that Holt's inappropriate behavior "may go beyond what" she had observed at school, Pinchin answered, "That never entered my mind. . . I didn't really see anything that rose to that, to that level at that, at that point in time."  (*Id.* at B129)  Pinchin further testified: "What we thought was going on with Rachel was that she just wanted, wanted her students to like her and you know, wanted to be a part of, part of their group, you know, but never, ever, thinking that it was anything beyond that."  (*Id.* at B137-38)  Thompson testified that he did not hear about any incidents of kissing or hugging beyond the kiss on the cheek in the library to the non-Plaintiff student.  (D.I. 77 at B242)  Thompson also had not had any suspicions that Holt might be "engaging in some sort of sexual behavior" with her students, adding that the administration did not have any "proof . . . indicating actual sex. . . ."  (*Id.* at B228)  While Thompson did acknowledge, "We had inklings that what we did know was going on . . . could turn to this," he also emphasized, "but we had no proof."  (*Id.* at B245)  When asked if he had any suspicions that Holt might be engaging in some sort of sexual behavior with any of her students, Thompson responded, "I would say no . . . we know about the lap sitting and the kissing in the library and, you know, after-hours texting, but none of that is indicating actual sex."  (*Id.* at B228)

At the relevant times, the District had policies and procedures intended to deal with sexual harassment.  Under the District's "Policy Manual," the District is required to comply with the State Code of Conduct.  (D.I. 71 at A46)  In turn, the State Code of Conduct mandates that the District's Board Members always ensure that they are maintaining the "public trust," including by

avoiding any appearance of impropriety. 29 Del. C. § 5801 *et. seq.* The District also had a policy on harassment of students by teachers. (*Id.* at A55) That policy defined sexual harassment as "a form of harassment which involves unwanted behaviors of a sexual nature." The policy further noted that sexual harassment may include "inappropriate touching or any act which would constitute sexual harassment under Title 11 of the Delaware Code." (*Id.* at A56) Moreover, the policy required that, "All allegations of harassment of a student shall result in immediate investigation." (*Id.*)

Plaintiff filed this lawsuit in the Superior Court for the State of Delaware, raising, *inter alia,* various state law claims, as well as a claim under 42 U.S.C. § 1983. (D.I. 77 at B1) Plaintiff named as defendants the District's School Board; all members of the District's School Board; the Superintendent, Dr. Bruce Harter; and Holt. On April 9, 2008, the Board, the Board Members, and Harter (collectively, the "School District Defendants") removed the case to federal court, pursuant to 28 U.S.C. § 1441. (D.I. 1)[6] On April 19, 2009, the School District Defendants filed their motion for summary judgment on all counts. (D.I. 69) The Court heard oral argument on the motion on December 17, 2010. *See* Transcript of Dec. 17, 2010 hearing ("Tr.").

## III.    LEGAL STANDARDS

A grant of summary judgment is appropriate only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The

---

[6]Another student filed a related case against the District in Superior Court. *See Oquendo v. District Sch. Dist.*, C.A. 08C-03-121 MBJ (Del. Super. Ct. 2008). That case has apparently settled. (D.I. 101)

moving party bears the burden of demonstrating the absence of a genuine issue of material fact.
*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). If the
moving party has carried its burden, the nonmovant must then "come forward with 'specific facts
showing that there is a genuine issue for trial.'" *Id.* at 587 (quoting Fed. R. Civ. P. 56(e)). The
Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make
credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133, 150 (2000). If the Court is able to determine that "there is no genuine issue as to
any material fact" and that the movant is entitled to judgment as a matter of law, summary
judgment is appropriate. *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005); Fed. R. Civ.
P. 56(c)).

To defeat a motion for summary judgment, the non-moving party must "do more than
simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S.
at 586; *see also Podobnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party
opposing summary judgment "must present more than just bare assertions, conclusory allegations
or suspicions to show the existence of a genuine issue") (internal quotation marks omitted).
However, the "mere existence of some alleged factual dispute between the parties will not defeat
an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only
where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The *Anderson* Court provides
further guidance: "If the evidence is merely colorable, or is not significantly probative, summary
judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v.
Catrett*, 477 U.S. 317, 322 (1986) (entry of summary judgment is mandated "against a party who

13

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## IV.    DISCUSSION

### A.    Plaintiff's Federal Claim: 42 U.S.C. Section 1983

Title 42 U.S.C. § 1983 ("Section 1983") provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Section 1983 provides a private cause of action against persons clothed with the authority of state law who violate a citizen's federal constitutional or statutory rights. Municipalities and other governmental bodies are "persons" for purposes of Section 1983 and, therefore, may be subject to suit. *See Monell v. Dep't of Soc. Servs.* 436 U.S. 658 (1978).

Here, Plaintiff has sued the Board Defendants and Superintendent Harter in their individual and official capacities. *See generally Monroe v. Pape*, 365 US 167 (1961) (holding that police officer may be sued in his individual capacity); *see also generally Kentucky v. Graham*, 473 U.S. 159 (1985) (noting that distinction between individual and official capacity "continues to confuse lawyers and confound lower courts"). Official capacity suits "generally represent only another way of pleading an action against *an entity* of which an officer is an agent." *Graham*, 473 U.S. at 165-66 (emphasis added); *see also A.M. v. Luzerne Cnty. Juvenile Detention Ctr.*, 372 F.3d 572, 580 (3d Cir. 2004) ("A suit against a governmental official in his or her official capacity is treated as a

suit against the governmental entity itself."). Hence, Plaintiff's suit against the Board Defendants and Harter in their official capacities is essentially a suit against the District, seeking to recover from the District. By contrast, Plaintiff's suit against the Board Defendants and Harter in their individual capacities seeks to recover from these defendants personally.

The evidentiary showing Plaintiff must make to press his Section 1983 claims against the Board Defendants and Harter in their official capacities is different from the evidentiary burden confronting him in pressing these same claims against the Board Defendants and Harter in their individual capacities. Similarly, the defenses available to the defendants are different in their official and individual capacities.

In particular, in suing the Board Defendants and Harter in their official capacities, Plaintiff must come forward with facts sufficient to establish that the District's "policy, custom, or practice" played a part in the alleged constitutional violations.[7] By contrast, in suing the Board Defendants and Harter in their individual capacities, Plaintiff must come forward with facts sufficient to show that, as Holt's supervisors, they had knowledge of or acquiesced in Holt's conduct. In terms of defenses, qualified immunity is a personal defense and therefore only available to officials sued in their individual capacities.

### 1. Official Liability under Section 1983

The Board Defendants and Harter contend that Plaintiff has failed to make a prima facie

---

[7] A single action by the final policymaker may be sufficient to impose liability on a municipality. *See Pembauer v. City of Cincinnati,* 475 U.S. 469 (1986). Here, however, Plaintiff has not alleged that any single action by the School District Defendants caused his constitutional injury.

showing that they violated Plaintiff's constitutional rights.[8]  The Third Circuit uses a two-prong test when a municipality is alleged to have caused a constitutional violation through its failure to take action: Plaintiff must produce evidence of (1) a policy or custom, and (2) that the municipality was deliberately indifferent.  *See Black v. Indiana Area Sch. Dist.,* 985 F.2d 707, 712 (3d Cir. 1993) ("In order to establish liability a plaintiff must demonstrate *both* that the defendant's policy, practice, or custom played an affirmative role in bringing about the sexual abuse *and* that the defendant acted with deliberate indifference to that abuse.") (emphasis added).

Because the Supreme Court has expressly rejected *respondeat superior* (i.e., vicarious liability) as a means of holding a municipality liable for constitutional violations perpetrated by its employees, Plaintiff must adduce facts sufficient to demonstrate that the Board Defendants and/or Harter maintained a "municipal policy of some nature" that caused his constitutional deprivation. *See Monell,* 436 U.S. at 691; *see also A.M. v. Luzerne Cnty. Juvenile Det. Ctr.,* 372 F.3d 572, 580 (3d Cir. 2004) ("A governmental entity . . . cannot be liable under a theory of respondeat superior or vicarious liability.").  In this way, the Supreme Court has attempted to "ensur[e] that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of the Cnty. Comm'rs v. Brown,* 520 U.S. 397, 403-04 (1997).

There are two means of demonstrating the required causal link between a municipal "policy" and an alleged constitutional violation.  First, a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" will suffice.  *City of St.*

---

[8]As the Brandywine School District is a public school district, there is no dispute that the Board Defendants and Harter act "under color of state law." *See Lugar v. Edmondson Oil Co.,* 457 U.S. 922 (1982); *Rendell-Baker v. Kohn,* 457 U.S. 830 (1982).

*Louis v. Praprotnik*, 485 U.S. 112, 121 (1988). Second, even if a policy has not received approval through "official decisionmaking channels," customs or practices may be the basis for municipal liability if they are so permanent and well settled that they operate as law. *See Kelly v. Borough of Carlisle*, 622 F.3d 248, 263 (3d Cir. 2010); *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 250 (3d Cir. 2007). That is, "acquiescence in a long-standing practice or custom" that "constitutes the standard operating procedure of the local governmental entity" is grounds for holding a municipality liable. *Jett v. Dallas Independent Sch. Dist.*, 491 U.S. 701, 737 (1989), *abrogated on other grounds by statute*, 42 U.S.C. 1981 § 1977(a).[9]

In addition to demonstrating that the municipality's policy or custom played an affirmative role in the constitutional deprivation, in cases in which a municipality's *failure* to act is alleged to have caused the harm, an additional showing is required.[10] Where "municipal liability is predicated upon a failure to act, the requisite degree of fault must be shown by proof of a background of

---

[9]In *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720 (3d Cir. 1989), the Third Circuit considered municipal liability in the context of sexual abuse in the public school system. The plaintiff presented evidence that the principal had received a previous complaint that the band director had attempted to sexually assault a different student. Additionally, there was evidence that the principal maintained a "personal file" on the teacher at his home rather than in the principal's personnel files at school, in which the principal documented several reports of sexual misconduct by the teacher. The student who had previously reported the alleged sexual assault had been forced to apologize and recant her story in front of the entire band. *See id.* at 728. The principal also received at least five other complaints of sexual abuse involving different teachers and students. In some of the earlier cases, the principal allegedly behaved in a similar fashion – that is, attempting to mitigate any potential damage by discrediting the students' stories or intimidating the students with an "It's your word against his" attitude. *Id.* at 729. Hence, the *Stoneking* case presented facts from which one might find a policy or custom of deliberate indifference to the obvious consequences of a teacher's behavior, given the principal's documented practice in responding to several complaints of sexual abuse.

[10]In addition, municipal policies or customs that are facially valid under federal law are also subject to the deliberate indifference standard. *See Kelly*, 622 F.3d at 263.

events and circumstances which establish that the policy of inaction is the functional equivalent of a decision by the [municipality] itself to violate the Constitution." *City of Canton v. Harris*, 489 U.S. 378, 394-95 (1989) (O'Connor, J. concurring). In *Canton*, the Court termed this "deliberate indifference." Deliberate indifference lies "somewhere between the poles of negligence at one end and purpose and knowledge at the other." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994) (adopting subjective theory of deliberate indifference in prison context). It is a "stringent standard," in which a municipal actor must "consciously disregard" a "known or obvious consequence of his action." *Brown*, 520 U.S. at 410.

Here, Plaintiff's Section 1983 claim against the Board Defendants and Harter in their official capacities is, in essence, that these defendants failed to protect him from sexual abuse by Holt. To survive summary judgment and proceed to trial on this claim, Plaintiff must point to record evidence sufficient to enable a reasonable juror to conclude that: (1) the District maintained a policy, custom, or practice that led to Holt's abuse; and (2) that the Board Defendants and/or Harter were aware of and consciously disregarded a substantial risk that an obvious consequence of their inaction would be Holt's sexual abuse of Plaintiff.[11] Here, Plaintiff has failed to meet his

---

[11]The Sixth Circuit has described a plaintiff's burden in the context of an "inaction theory" in the following manner: "plaintiff must establish: (1) the existence of a clear and persistent pattern of sexual abuse by school employees; (2) notice or constructive notice on the part of the School Board; (3) the School Board's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the School Board's custom was the 'moving force' or direct causal link in the constitutional deprivation." *Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 506 (6th Cir. 1996), *abrogated on other grounds by Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998), *as stated in Phillips v. Anderson Cnty. Bd. of Educ.*, 2006 U.S. Dist. LEXIS 92120 (E.D. Tenn. Dec. 19, 2006); *see also Craig v. Lima City Sch. Bd. of Educ.*, 384 F. Supp. 2d 1136 (N.D. Ohio 2005). Other circuits follow the *Claiborne* case's rationale. *See, e.g., Reynolds v. Giuliani*, 506 F.3d 183, 191-92 (2d Cir. 2007) (requiring that "policy of inaction" be "functional equivalent" of decision by municipality itself); *T.Z. v. City of New York*, 635 F. Supp. 2d 152

burden with respect to both the policy or custom prong and the deliberate indifference prong of his Section 1983 claim.

Plaintiff, of course, does not point to any official policy that permits District students to be sexually abused by District teachers. Instead, Plaintiff, argues that practices and customs maintained by the School District Defendants "reflect their deliberate indifference to notice of plaintiff's sexual abuse and harassment by Holt." (D.I. 76 at 31-32) Revealingly, however, the primary portion of Plaintiff's brief that purports to describe the record evidence establishing a policy or custom and deliberate indifference – Section II.A.3 of his Answering Brief (D.I. 76 at 2-14, 23-28) – actually describes Plaintiff's record support for his state-law gross negligence claim.[12] The problem with Plaintiff's mixing of the two legal standards is that "gross negligence encompasses a lower level of intent than deliberate indifference." *Sanford v. Stiles*, 456 F.3d 298, 307 (3d Cir. 2006).[13] While the Court agrees with Plaintiff that the record provides a basis from

---

(E.D.N.Y. 2009) ("This [*Doe v. Claiborne*] analysis is consistent with the Second Circuit's provisions for addressing inaction claims arising in the context of the City failing to prevent manifest misconduct on the part of its employees.").

[12]Specifically, Plaintiff writes: "The practices and customs of the District Defendants which reflect their deliberate indifference to notice of plaintiff's sexual abuse and harassment by Holt are detailed in Facts and **II.A.3.**, above." (D.I. 76 at 31-32)

[13]*See also Williams v. Jackson*, 600 F.3d 1007 (8th Cir. 2010) ("The claim against Parsons is in the nature of a deliberate-indifference claim, and such a claim requires more than a showing of simple or even gross negligence."); *Jones v. Muskegon Cnty.*, 2010 U.S. App. LEXIS 23034 (6th Cir. Nov. 4, 2010) ("The Sixth Circuit, however, has determined that the standard for deliberate indifference and the standard for gross negligence are different. This court . . . stated that [i]t is a very high standard of culpability, exceeding gross negligence."); *Waubanascum v. Shawano Cnty.*, 416 F.3d 658, 668 (7th Cir. 2005) ("Negligence or even gross negligence does not suffice to give rise to liability under § 1983."); *Doe v. Taylor Independent Sch. Dist.*, 15 F.3d 443, 453 n.7 (5th Cir. 1994) (distinguishing "deliberate indifference" from "gross negligence" by noting that "the former is a heightened degree of negligence, [whereas] the latter is a lesser form of intent.").

which a reasonable juror may find the Board Defendants and Harter committed gross negligence (as will be described further in connection with Plaintiff's state law claims), the Court concludes that the record does *not* provide a basis for a reasonable juror to conclude that the District maintained a policy or custom of deliberate indifference to Holt's sexual abuse. *See generally T.Z. v. City of New York*, 635 F.Supp. 2d at 178 ("[D]eliberate indifference in this context does not mean a collection of sloppy, or even reckless, oversights; it means evidence showing an obvious, deliberate indifference to sexual abuse.").

Although Plaintiff does not expressly state his theory of the operative policy or custom of deliberate indifference, the Court infers from the alleged failings listed by Plaintiff – failing to suspend Holt, failing to interview students or parents, failing to investigate Holt's alleged insubordination, failing adequately oversee Pinchin, failing to warn Plaintiff, failing to report Holt, and failing to follow District Policy – that Plaintiff's theory is that the School District Defendants had a sufficiently well-settled practice of failing to supervise teachers. This is a difficult theory to prove. *See, e.g., Mize v. Tedford*, 375 Fed. Appx. 497, 500 (6th Cir. 2010) ("This 'failure to supervise' theory of municipal liability is a rare one. Most agree that it exists and some allege they have seen it, but few actual specimens have been proved."). Failing to adequately supervise, monitor, or train teachers "can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations." *Berg v. Cnty. of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000); *see also Christopher v. Nestlerode*, 240 Fed. Appx. 481, 489-90 (3d Cir. 2007) (noting also that failure to train cases are treated similarly to failure to supervise cases). Indeed, "as a general rule, an isolated incident, however unfortunate, does not demonstrate evidence of [a municipality's] persistent and widespread policy and will not be considered so pervasive as to be a

custom or practice." *Doe v. Sch. Bd. of Broward Cty*, 604 F.3d 1248, 1263-64 (11th Cir. 2010);
*see also Nestlerode*, 240 Fed. Appx. at 489-90 (noting that a single constitutional violation may
provide basis for municipal liability, but only where need for more training or supervision is "so
obvious and the inadequacy so likely to result in the violation of constitutional rights" that the
municipality's inaction amounts to deliberate indifference).

Hence, relevant to both the policy and deliberate indifference prongs is the fact that the
record reveals no evidence that Holt engaged in sexual misconduct prior to the March 2006 abuse
of Plaintiff. Moreover, the record does not contain evidence from which a reasonable juror could
conclude that any of the School District Defendants had actual or constructive knowledge that
Holt had ever previously engaged in sexual misconduct. *See Gottlieb v. Laurel Highlands Sch.
Dist.*, 272 F.3d 168, 175 (3d Cir. Pa. 2001) (granting summary judgment in absence of evidence
that "policymakers were aware of similar conduct in the past, but failed to take precautions against
future violations, and that this failure, at least in part, led to their injury."). To be clear, the Court
is not holding that a school district cannot, as a matter of law, be liable under any circumstances
for the first occasion a teacher sexually abuses a student. Nonetheless, under the circumstances
presented in the instant case, the absence of evidence of prior sexual misconduct by Holt or other
teachers, coupled with the disciplinary actions the School District Defendants took against Holt
based on the improper conduct of which they were aware, make it all the more difficult for Plaintiff
to meet his burden. *See generally Kline v. Mansfield*, 255 Fed. Appx. 624, 629 (3d Cir. Nov. 27,
2007) (granting defendants summary judgment when "the record in this case did not show that the
school officials had notice of any sexual misconduct"); *K.K. v. Weeks*, 2007 WL 1455888, at *23
(M.D. Pa. May 15, 2007) ("Plaintiffs' failure to produce evidence showing concealment,

21

encouragement, acceptance or *even any awareness of sexual abuse* against [abused students] . . .

prohibits Plaintiffs from proceeding on their *Monell* [municipal liability] claim.") (emphasis added);

*C.M. v. Southeast Delco Sch. Dist.*, 828 F. Supp. 1179, 1185 (E.D. Pa. 1993) (denying summary

judgment "in light of what defendants allegedly knew about [teacher's] conduct"); *see also*

*Kurilla*, 68 F. Supp. 2d at 566 (denying summary judgment where principal had knowledge of

violent teacher's prior episodes of violence).  Here, then, Plaintiff has failed to meet his burden to

produce evidence that the School District Defendants had a practice or custom of deliberate

indifference which had, as an obvious result, Holt's abuse of Plaintiff.  *See generally D.C.G. &*

*P.J.G v. Wilson Area Sch. Dist.*, 2009 WL 838548, at \*6 (E.D. Pa. Mar. 27, 2009) (granting

summary judgment to defendants sued in their official capacity where defendants "did not sit on

their hands in response to these incidents" of abuser's improper conduct).

Accordingly, the Court will grant summary judgment to the Board Defendants and Harter

in their official capacities with respect to Plaintiff's Section 1983 claim.

### 2.    State Created Danger Theory

Plaintiff also responds to the School District Defendants' motion for summary judgment by

invoking the "state-created danger theory," which Plaintiff contends is an alternative means of

attaching liability to the School District Defendants.  The Third Circuit has recognized a state-

created danger theory of liability under Section 1983.  *See Kneipp v. Tedder*, 95 F.3d 1199, 1201

(3d Cir. 1996).[14]

---

[14]The parties conflate the state-created danger theory with a separate theory based on a
"special relationship" between the Plaintiff and the School District Defendants.  This special
relationship theory has been rejected by the Third Circuit in the public school context.  *See D.R.*
*Middle Bucks Area Vocational Technical Sch.*, 972 F.2d 1364 (3d Cir. 1992) *(en banc)*; *see also*
*Gremo v. Karlin*, 363 F.Supp. 2d 771, 782 (E.D. Pa. Mar. 1, 2005) ("The holding in *D.R.* that

To prevail on a state-created danger theory, a plaintiff must prove the following four elements: "(1) the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." *Sanford*, 456 F.3d at 304-05.

The second prong of this test – the degree of culpability – is a high threshold to satisfy and will often decide the case. *See Sanford*, 456 F.3d at 305 ("[T]he outcome of a state-created danger case will often turn on the [the culpability] prong."). The exact degree of culpability "necessary to reach the conscience-shocking level depends upon the circumstances of a particular case." *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir. 1999). In *Sanford*, the Third Circuit elaborated on the "shocks the conscience standard," stating: "[s]ometimes, an intent to cause harm has been required; other times, deliberate indifference has been sufficient." *Sanford*, 456 F.3d at 304-05.

It is clear that the degree of culpability required to prevail on a state-created danger theory

---

schools and students do not have a special relationship . . . continues to be binding in the Third Circuit."). The state-created danger theory, however, is separate from the "special relationship" theory.

The way in which a state-created danger theory interacts with the theory of deliberate indifference is a source of some confusion. *See Sanford v. Stiles*, 456 F.3d 298, 310 (3d Cir. 2006) (noting that Third Circuit has not explicitly confronted this question). Furthermore, although Plaintiff is not entirely clear, the Court understands Plaintiff to be asserting the state-created danger theory as against the School District Defendants in their official, as opposed to individual, capacities.

in the circumstances presented here is at least deliberate indifference.[15] It follows that, since the record here does not provide a basis for a reasonable juror to conclude that either the Board Defendants or Harter acted with deliberate indifference, Plaintiff has also failed to meet his burden to show that these defendants acted in a manner that shocks the conscience. Accordingly, the state-created danger theory does not help Plaintiff's Section 1983 official capacity claim to overcome the School District Defendants' motion for summary judgment.[16]

### 3. Individual Liability under Section 1983

Plaintiff also contends that Dr. Harter is individually liable under Section 1983.[17] In response, Harter contends that he is entitled to qualified immunity. The Supreme Court has

---

[15]The Third Circuit has stated that in some circumstances – such as when "split-second" decisions are not required but something "more urgent than an unhurried judgment" is – the standard is that "defendants disregard a great risk of serious harm rather than a substantial risk." *Sanford*, 456 F.3d at 307.

[16]In *D.R. v. Middle Bucks Area Vocational Technical Sch.*, 972 F.2d 1364 (3d Cir. Pa. 1992), the Third Circuit confronted a case involving allegations of sexual abuse in a public school setting. The Third Circuit addressed the state-created danger theory in relation to allegations that the school district administrators had failed to adequately protect students against physical and sexual abuse at the hands of fellow students. *See id.* at 1373-76. Similar to the Plaintiff's allegations in the instant case, the plaintiffs in *D.R.* alleged that the school administration had placed the students under the supervision of an untrained student teacher and failed effectively to supervise the student teacher; failed to report student misconduct to parents or other authorities; did not adequately investigate the allegations of abuse; and refused to intervene when the administration allegedly learned of the abuse. *See id.* The Court concluded that, while the administration displayed "indefensible passivity" and "stood by and did nothing when suspicious circumstances dictated a more active role for them," the administration could not be deemed to have either created or exacerbated the danger. *Id.* at 1376. Here, given the Court's conclusion with respect to the Plaintiff's failure to show deliberate indifference, it is not necessary to determine if – as in *D.R.* – some other basis also exists for granting the summary judgment on Plaintiffs' state-created danger theory.

[17]Plaintiff initially sued the Board Defendants under Section 1983 in their individual capacities as well. Subsequently, however, Plaintiff has withdrawn his Section 1983 claim against the Board Defendants in their individual capacity. (Tr. at 3)

established a two-part test for qualified immunity inquiries. *See Saucier v. Katz*, 533 U.S. 194 (2001), *abrogated in part by Pearson v. Callahan*, 555 U.S. 223, 128 S.Ct. 808, 818 (2009). First, a court asks whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." *Reedy v. Evanson*, 615 F.3d 197, 223 (3d Cir. 2010). Second, if, on a favorable reading of the facts, a constitutional right has been violated, the question then becomes whether this right was clearly established – that is, whether a reasonable official would understand that his conduct in a given situation violated clearly established legal standards.[18] *See id.* If "no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.*[19]

_____

[18]It is within the court's discretion to decide which step of the qualified immunity analysis to conduct first. *See Pearson*, 555 U.S. at 128 ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

[19]The Court acknowledges some lack of clarity in the case law – and in the parties' briefing – as to the interaction between supervisory liability and the doctrine of qualified immunity. For example, the parties identify Plaintiff's constitutional right as the "right to be free from sexual abuse." (D.I. 76 at 40; D.I. 70 at 22) While, of course, Plaintiff has such a right, *see Stoneking*, 882 F.2d at 727, there is no allegation here that Harter, a supervisor, directly violated that right. Instead, the issue here could be stated as whether Plaintiff had a clearly established constitutional right to be free of a public school superintendent's deliberate indifference to sexual abuse being committed against the student by a teacher. Alternatively, the issue might be stated as whether Plaintiff can demonstrate supervisory liability against Harter; if Plaintiff cannot, then undertaking further qualified immunity analysis becomes unnecessary. *See generally Camilo-Robles v. Hoyos*, 151 F.3d 1, 7 (1st Cir.1998) (exploring "the relationship between qualified immunity and supervisory liability"); *D.C.G.*, 2009 U.S. Dist. LEXIS 25446, at *40 (declining to address qualified immunity where no constitutional right was violated by supervisor defendants); *Maier v. Canon McMillan Sch. Dist*, 2009 U.S. Dist. LEXIS 74342, at *13-15 (Aug. 20, 2009) (granting individual defendants summary judgment without addressing qualified immunity). On the record before the Court, the result is the same whether the issue is approached initially from the qualified immunity perspective or, alternatively, from the perspective of Plaintiff's burden to

Where, as here, individual liability is predicated on a defendant's supervisory role, the supervisor-defendant "must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior . . . . Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence . . . ." *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir. 1988); *see also Baker v. Monroe Twp.,* 50 F.3d 1186, 1194 (3d Cir. 1995) (noting that actual knowledge can be inferred from defendant's behavior). In other words, a supervisor may only be held liable for a constitutional violation in which the supervisor can fairly be said to have had a personal involvement.[20]

There are two ways of demonstrating the personal involvement of supervisors sufficient to justify imposing Section 1983 liability on a supervisor in his individual capacity. First, supervisors can be liable "if they established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *See A.M.,* 372 F.3d at 586 (3d Cir. 2004). Here, as has already been explained in connection with Plaintiff's official capacity claim, the record does not demonstrate that the District (including Harter) established and maintained any such policy, practice, or custom.

Alternatively, supervisors can be "liable if they participated in violating plaintiff's rights,

---

establish supervisory liability. Either way, Harter is entitled to summary judgment.

[20]The Court recognizes that, after *Ashcroft v. Iqbal,* "supervisory liability" in the *Bivens* and Section 1983 context is a "misnomer." 129 S.Ct. 1937, 1949 (2009). Instead, as the Supreme Court made clear, each government agent "is only liable for his or her own misconduct." *Id.* As the Third Circuit has observed, *Iqbal* introduced some degree of confusion into Section 1983 jurisprudence based on a "failure to supervise" theory. *See, e.g., Santiago v. Warminster Twp.,* 2010 U.S. App. LEXIS 25414, at *18 n.8 (3d Cir. Dec. 14, 2010) ("Numerous courts, including this one, have expressed uncertainty as to the viability and scope of supervisory liability after *Iqbal.*"); *see also Parrish v. Ball,* 594 F.3d 993, 1001 (8th Cir. 2010) ("The Supreme Court's recent pronouncement in *Iqbal* may further restrict the incidents in which the 'failure to supervise' will result in liability.").

directed others to violate them, or, as the person[s] in charge, had knowledge of and acquiesced in [their] subordinates' violations." *Id.*; *see also Brown v. Rinehart*, 325 Fed. Appx. 47, 50 (3d Cir. Apr. 30, 2009) (granting qualified immunity to supervising police chief in absence of evidence of personal involvement through participation, knowledge, or acquiescence in violation of constitutional rights); *A.M.*, 372 F.3d at 582 (discussing two theories of supervisor liability); *Atkinson*, 316 F.3d at 270 (denying summary judgment to supervisor in light of material and genuine questions about supervisor's "actual knowledge of" and "acquiesc[ence] in" subordinate's violations).

While the Third Circuit has not adopted a test for determining when supervisory liability exists based on sexual harassment in the public school context, several other courts of appeals have done so, and the Court considers those tests to be highly instructive. Thus, in order to hold Harter liable in his individual capacity, Plaintiff must show:

> (1) the defendant learned of facts or a pattern of inappropriate sexual behavior by a subordinate pointing plainly toward the conclusion that the subordinate was sexually abusing the student; and
>
> (2) the defendant demonstrated deliberate indifference toward the constitutional rights of the student by failing to take action that was obviously necessary to prevent or stop the abuse; and
>
> (3) such failure caused a constitutional injury to the student.

*Doe v. Taylor Ind. Sch. Dist.*, 15 F.3d 443, 454 (5th Cir. 1994) (en banc); *see also Doe v. Flaherty*, 623 F.3d 577, 585 (8th Cir. 2010) (requiring "notice of a pattern of unconstitutional acts" by teacher); *Doe v. Sch. Bd. of Broward Cnty.*, 604 F.3d 1248, 1266 (11th Cir. 2010) (adopting similar test requiring "history" of "obvious, flagrant, [or] rampant" abuse); *Baynard v.*

27

*Malone*, 268 F.3d 228, 236 (4th Cir. 2001) (adopting similar test requiring supervisor have knowledge of "pervasive and unreasonable risk" of constitutional injury); *Gates v. Unified Sch. Dist. No. 449 of Leavenworth Cnty.*, 996 F.2d 1035, 1041 (10th Cir. 1993) (same). At least two district courts within the Third Circuit have adopted the Fifth Circuit's test, requiring facts "pointing plainly toward the conclusion that the subordinate was sexually abusing" the student, in order to satisfy the knowledge requirement for supervisor liability. *See Chancellor v. Pottsgrove Sch. Dist.*, 501 F. Supp. 2d. 695, 709-10 (E.D. Pa. 2007); *D.C.G.*, 2009 U.S. Dist. LEXIS 26446, at *33.

Here, there is insufficient record evidence to permit a reasonable juror to find that Harter had actual knowledge of sexual abuse by Holt. Indeed, as has already been noted, there is no evidence that Holt engaged in sexual abuse prior to March 24, 2006. Nor does the record permit a finding that Harter "learned of facts or a pattern of inappropriate sexual behavior by a subordinate pointing plainly toward the conclusion that the subordinate was sexually abusing the student," *D.C.G.*, 2009 U.S. Dist. LEXIS 26446, at *33, or that Harter had knowledge of a "known" and "obvious" risk that the sexual abuse was ongoing or was practically certain to occur. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997) (noting that defendant must be aware of known or obvious consequence of action); *Brown v. Callahan*, 623 F.3d 249, 255 (5th Cir. 2010) (noting that supervisor/municipal actor must have disregarded known or obvious consequence that failure to supervise would result in constitutional violation).

It is undisputed that no administrator received any complaints, whether from other teachers, parents, or students, that Holt was actually sexually abusing Plaintiff, or any other student. Harter testified that Debbie Bullock, the Director of Human Resources, first brought

Holt's problematic behavior to his attention approximately a "couple of months, maybe three months before [he] got the call from Newcastle County Police" that Holt had been arrested for sexually abusing Plaintiff. (D.I. 78 at B758) Harter testified, and Plaintiff does not dispute, that the only information about which Harter had actual notice was that Holt was driving students home in her personal vehicle and that Holt had "kissed a student on the cheek." (*Id.* at B761)

Plaintiff alleges that Harter "was aware that these activities could lead to sexual abuse or harassment, but never determined or followed up as to how Pinchin had investigated the situation to determine whether sexual harassment was occurring, how it was being monitored, or whether it was resolved." (D.I. 76 at 40) Even assuming, *arguendo*, that the record supports Plaintiff's contentions, this is simply an inadequate basis from which a reasonable juror could find the requisite knowledge on Harter's part to impose individual liability under Section 1983. Plaintiff must demonstrate *not* that Harter knew that driving students home could *potentially* lead to sexual abuse, but instead that Harter knew enough to "point plainly" toward ongoing sexual abuse by Holt, or at least a "known" and "obvious" risk that such abuse was practically certain to happen. The record simply does not support such conclusions here.

Accordingly, the Court will grant Harter's motion for summary judgment in his individual capacity.

## B.     State Law Claims

In addition to his federal Section 1983 claim, Plaintiff's complaint also asserts several claims against the School District Defendants under Delaware state law. Specifically, Plaintiff alleges that the School District Defendants were grossly negligent and negligent, breached their

fiduciary duty owed to Plaintiff, and engaged in fraud.  (D.I. 77 at B1)[21]

The School District Defendants contend that the Delaware Tort Claims Act ("DTCA" or "the Act") bars all of Plaintiff's state law claims because Plaintiff cannot establish that they acted in bad faith or with gross negligence. *See* 10 Del. C. § 4001 *et. seq.* In the alternative, the School District Defendants contend that the Plaintiff cannot establish a prima facie showing on any of the state law claims. (D.I. 70 at 28; *Id.* at 33)

Before turning to the School District Defendants' contentions, the Court must first address whether it should use its discretion to exercise supplemental jurisdiction over Plaintiff's state law claims, given the Court's decision to grant the School District Defendants summary judgment on the only federal claim asserted by Plaintiff.

### 1.    Supplemental Jurisdiction

This Court's jurisdiction over this action was originally premised on 28 U.S.C. § 1331, as Plaintiff's Section 1983 claim presents a federal question. A federal court may hear state law claims that are closely related to a federal cause of action, so long as the state law claims arise out of a "common nucleus of operative fact" with the claims that give rise to the district court's original jurisdiction. 28 U.S.C. § 1367; *see also De Asencio v. Tyson*, 342 F.3d 301, 307-08 (3d Cir. 2003). Supplemental jurisdiction promotes "judicial economy, convenience, and fairness to litigants." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).

Whether a district court will exercise its supplemental jurisdiction is within the court's discretion (subject to certain statutory exceptions that are not pertinent here). *See, e.g., New*

---

[21]Plaintiff also initially alleged an assault and battery claim against the School District Defendants under a *respondeat superior* theory. At oral argument, Plaintiff's counsel indicated that this claim was being withdrawn as against the School District Defendants. (Tr. at 3-4)

*Rock Asset Partners v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1505 (3d Cir. 1996). In this case, since the "same acts violate parallel federal and state laws, the common nucleus of operative facts is obvious." *Lyon v. Whisman*, 45 F.3d 758, 761 (3d Cir. 1995). Thus, were Plaintiff's Section 1983 claims proceeding to trial, it would almost certainly follow that Plaintiff's state law claims would proceed in this Court as well.[22]

Generally, where, as here, all substantive federal claims are resolved prior to trial, the primary justifications for retaining jurisdiction over state law claims are no longer viable. *See, e.g., Seabrook v. Jacobson*, 153 F.3d 70, 72 (2d Cir. 1998) (noting that it is particularly appropriate for district court to dismiss state claim where "the federal claim on which the state claim hangs has been dismissed"); *Parker & Parsley Petroleum v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992) ("Our general rule is to dismiss state claims when the federal claims to which they are pendent are dismissed."); *see also* 16 Moore's Federal Practice Civil § 106.66. Nonetheless, this is a general rule and not a mandatory requirement. *See Tomaiolo v. Mallinoff*, 281 F.3d 1 (1st Cir. 2002) (allowing state constitutional claims to go forward even when federal claims were dismissed); 16 Moore's Federal Practice Civil § 106.66 ("The district court retains the power to hear a supplemental state claim after dismissal of all federal claims if, on balance, the underlying values indicate that it should be heard.").

This case presents one of the rare instances in which the balance of the relevant factors favors exercising supplemental jurisdiction, despite the absence of any federal claim that will be proceeding to trial. First, with respect to judicial economy, most relevant is that this Court has

---

[22]The supplemental jurisdiction inquiry is fact-specific and therefore turns on the unique circumstances presented in a particular case.

31

expended substantial resources on this case during the more than two and one-half years since it was removed here from state court, including resources devoted to presiding over mediation and later preparing for and hearing oral argument on – and writing this opinion resolving – the pending motion for summary judgment. *See, e.g., Mendoza v. Murphy*, 532 F.3d 342, 346-47 (5th Cir. 2008) (finding no abuse of discretion in retaining supplemental jurisdiction when case had been pending in federal court for more than a year, discovery deadline had passed, and parties had fully briefed defendants' motion for summary judgment); *Ametex Fabrics, Inc. v. Just in Materials, Inc.*, 140 F.3d 101 (2d Cir. 1998) (affirming exercise of supplemental jurisdiction when parties had engaged in substantial discovery under expedited schedule and held settlement conference before magistrate judge). Pursuant to the Court's scheduling orders, discovery is complete, a pretrial conference is scheduled for next month, and trial is scheduled for February 2011. It would be inefficient at this late date to kick this case back to state court, thereby necessitating that a state court judge study and rule on the summary judgment issues with respect to the state law claims and (potentially) fit the case into that judge's no-doubt already crowded trial docket.

Second, it would be more convenient for all parties to try this case now, which, as a practical matter, requires that the case remain in federal court. During oral argument, counsel for the School District Defendants effectively conceded this point.[23]

Third, fairness also favors retaining jurisdiction here, again due to the timing issues. The events giving rise to this case primarily occurred approximately five years ago; any additional

---

[23]*See* Tr. at 20-21: "Well, your Honor, you presented a pretty compelling case to keep it here based on how many lawyers we've been through, discovery being complete and everything else. So I can tell which way you are leaning. I'm not going to say remand us back."

significant delay in getting this matter to trial could cause memories to fade even further. Plaintiff,

who was in sixth grade when sexually assaulted by Holt, turns 18 next month, and has a legitimate

interest in getting this case to trial. Additionally, given that it was Defendants who removed this

case from state court to federal court in the first place, it would be difficult for Defendants now to

argue that trial in federal court is somehow unfair to them.

Finally, while comity likely always favors returning state-law claims to state court, here,

given all of the other circumstances already mentioned, comity does not outweigh the other

factors that favor exercising supplemental jurisdiction. In this regard, it is also worth noting that,

for reasons that will be explained below, the Court will be granting the School District Defendants

summary judgment on three of Plaintiff's state law claims, and only one claim (for gross

negligence) will be proceeding to trial.

Therefore, the Court concludes that the appropriate exercise of its discretion in the unique

circumstances presented by this case is to retain supplemental jurisdiction and allow Plaintiff's

state law claims to be resolved here in federal court.

### 2.    Gross Negligence and Negligence

Plaintiff alleges both negligence (Count III) and gross negligence (Count IV) against the

Board Defendants and Superintendent Harter. (D.I. 77 at B11-12) As the School District

Defendants correctly contend, before the Court can assess the merits of these claims, the Court

must first determine whether Plaintiff can "over[come] the protections afforded them [the

Defendants] by the Act." (D.I. 70 at 28)

The Delaware Tort Claims Act provides, in pertinent part, that:

> no claim or cause of action shall arise . . . against the State or any
> public officer or employee, including the members of any board,

33

commission, conservation district or agency of the State, whether elected or appointed . . . where the following elements are present:

> (1) The act or omission complained of arose out of and in connection with the performance of an official duty requiring a determination of policy, the interpretation or enforcement of statutes, rules or regulations, the granting or withholding of publicly created or regulated entitlement or privilege or any other official duty involving the exercise of discretion;

> (2) The act or omission complained of was done in good faith and in the belief that the public interest would best be served thereby; and

> (3) The act or omission complained of was done without gross or wanton negligence . . .

10 Del. C. § 4001.

Both parties acknowledge that "to avoid application of the Act, Plaintiff must show that the School District engaged in: (1) ministerial actions, (2) actions taken in bad faith and not in the public interest, or (3) actions of gross or wanton negligence." (D.I. 70 at 28; D.I. 76 at 16)  *See also Scarbrough v. A.I. DuPont High Sch.*, 1986 WL 10507, at *2 (Del. Super. Ct. Sept 17, 1986). The parties disagree, of course, as to whether Plaintiff can show any of these three things. The Court will address each in turn.

### a.    Ministerial Actions

Under the DTCA, when public officials perform discretionary acts, they may be held liable only for gross negligence; on the other hand, when public officials are performing ministerial actions, they may be held accountable when their actions are merely negligent. *See Whitsett v. Capital Sch. Dist.*, 1999 Del. Super. LEXIS 70, at *3 (Del. Super. Ct. Jan. 28, 1999) (noting that state entities may be liable for mere negligence for ministerial actions). The School District

Defendants contend that all of the actions they took were discretionary as opposed to ministerial. (D.I. 70 at 29) *See also O'Connell v. Lebloch*, 2000 Del. Super. LEXIS 128 (Del. Super. Ct. Apr. 19, 2000). The Court agrees. Decisions about whether to hire a person, fire a person, or discipline a person are discretionary. *See Simms v. Christina Sch. Dist.*, 2004 Del. Super. LEXIS 43 (Del. Super. Ct. Jan. 30, 2004) ("I think it clear that the decision to hire Connor as a residential advisor was discretionary").

Contrary to Plaintiff's assertions, there were no "hard and fast rules" concerning Holt's supervision, in the difficult and troubling circumstances in which this case arose. It is not enough to say, as Plaintiff does, that under District policy and state law the School District Defendants were mandated to conduct an investigation and/or file a report. The District's policy mandated investigation of an allegation of sexual harassment, but discretion was nonetheless involved in assessing whether (and when) the concerns raised regarding Holt amounted to such an allegation. Additionally, the District did conduct some investigation, as is evident from the recitation of the factual background earlier in this Opinion. With respect to state law, it is true that 16 Del. C. § 903 mandates that "[a]ny person, agency, organization or entity who knows or in good faith suspects child abuse or neglect *shall* make a report" (emphasis added), but here the record does not establish that any of the School District Defendants knew or in good faith suspected that Holt was abusing Plaintiff until after she did abuse him in late March 2006. In sum, determining precisely when a reporting obligation is triggered, how to proceed with an investigation, what to report, and evaluating an evolving situation of the type the District encountered with Holt, all involve an exercise of discretion. *See O'Connell*, 2000 Del. Super. LEXIS 128, at *20 (noting that when officials' behavior involves "a choice of methods," officials are protected by the Act).

35

### b. Bad Faith Actions

The DTCA provides no shelter from liability for actions by a public official taken in bad faith. Plaintiff contends that the School District Defendants' actions with respect to Holt were taken in bad faith. In Plaintiff's view, the School District Defendants did not discipline Holt aggressively enough and failed to do so because they were afraid of being sued. (D.I. 76 at 30-31) To Plaintiff, the School District Defendants acted in bad faith by not predicating their conduct solely on the best interests of the District's students.

The School District Defendants counter that Plaintiff's allegations of bad faith are "unreasonable" and "absurd." (D.I. 70 at 31) In the School District Defendants' view, their efforts to comply with applicable District policies, with the District's collective bargaining agreement with its teachers' union, and with state law all demonstrate their good faith.

The Court agrees with the School District Defendants that the record is devoid of any evidence that any of them acted in bad faith. Certainly, the School District Defendants' attempt to comply with its policy, statutory, and contractual obligations, all while attempting to protect the constitutional and statutory rights of its students (including Plaintiff), does not amount to bad faith conduct.

### c. Gross Negligence

Plaintiff concedes that, should the Court determine (as it has) that the School District Defendants' conduct in supervising Holt and responding to complaints about her were discretionary and were taken in good faith, Plaintiff must then create a genuine dispute of material fact that the School District Defendants' conduct was "wanton" or "grossly negligent. (D.I. 76 at 17) The Act does not provide immunity for actions – even discretionary, good faith actions – that

36

are wanton or grossly negligent. *See Hughes ex rel. Hughes v. Christina Sch. Dist.*, 2008 WL 73710, at *4 (Del. Super. Ct. Jan. 7, 2008) (granting summary judgment to school district defendants where there was no evidence of gross negligence or wanton conduct).

Under Delaware law, gross negligence is a higher level of negligence representing an extreme departure from the ordinary standard of care. *See Browne v. Robb*, 583 A.2d 949, 953 (Del. 1990). A person acts wantonly when, "with no intent to cause harm," she "performs an act so unreasonable and dangerous" that the person knows or should known that "there is an eminent likelihood of harm which can result." *Hughes*, 2008 WL 73710, at *4. Wanton conduct is the "I don't care attitude." *Id.*

There is record evidence that, at times between at least September 2005 and early March 2006, Holt was: sitting on students' laps; hugging and kissing students on the cheek; driving students home in a personal vehicle, even after being directed not to do so; instant messaging students late at night; socializing with students on weekends; and calling students "boo" or "baby." Plaintiff also finds in the record a litany of actions (and inaction) that, he alleges, falls so far short of the ordinary standard of care in responding to Holt's inappropriate behavior as to constitute wanton conduct or gross negligence. For example, Plaintiff contends that the District Defendants failed to suspend Holt, failed to interview students and parents, failed to investigate Holt's insubordination, failed to exercise effective oversight, failed to warn students, failed to increase Holt's classroom monitoring, failed to report Holt's behavior to the appropriate authorities, and failed to follow the District's own policy. (D.I. 76 at 23-29) On each of these points, the Court agrees that the record shows a genuine dispute of material fact, necessitating resolution by a factfinder. A reasonable jury could find that the School District Defendants'

37

responses to Holt's behaviors were grossly inadequate.[24]

In support of his position, Plaintiff also provides the expert testimony of Carol Schreffler, a school administrator with thirty-five years' experience in the classroom and in administrative capacities in Delaware. (D.I. 78 at B486) According to Schreffler, Holt's behavior was "outrageous;" it was "very, very unusual and inappropriate behavior" that should have raised a "red flag." (D.I. 78 at B510) Schreffler further opines that Pinchin and Thompson's "lack of action" in supervising Holt was "so far from the accepted norms of school administration that it absolutely shows incompetent behavior." (*Id.* at 551)

* * *

In sum, application of the DTCA to the facts of record in this case requires that the School District Defendants' motion for summary judgment be granted with respect to Plaintiff's state law claim of negligence and denied with respect to Plaintiff's state law claim of gross negligence.

### 3.     Fraud

Count VI of Plaintiff's complaint alleges the District Defendants engaged in fraud: "Defendants falsely represented to the plaintiff that Holt was a teacher of integrity and worthy of Plaintiff's trust." (D.I. 77 at B14) The complaint goes on to allege that, "Defendants knew that representation was false, or it was made with reckless indifference to the truth." (*Id.*)

In order to survive summary judgment on their fraud claim, Plaintiff must show that the

---

[24]In reaching this conclusion, the Court does not mean to suggest that a reasonable jury must side with Plaintiff. As the School District Defendants point out, the record also contains evidence that they did (eventually) suspend Holt (for three days); they interviewed students and parents; they increased observations of Holt's classroom; and that Pinchin and Thompson brought their concerns about Holt to the attention of Human Resources Director Bullock and, ultimately, Superintendent Harter.

record contains sufficient evidence from which a reasonable juror could find each of the following
elements:

> (1)   a false representation, usually one of fact, made by the
>        defendant;
>
> (2)   defendant's knowledge or belief that the representation was false or was
>        made with reckless indifference to the truth;
>
> (3)   an intent to induce the plaintiff to act or to refrain from
>        acting;
>
> (4)   the plaintiff's action or inaction taken in justifiable reliance
>        upon the representation; and
>
> (5)   damage to the plaintiff as a result of such reliance.

*Schmeusser v. Schmeusser*, 559 A.2d 1294, 1297 (Del. 1989).

It follows from all that has already been said in connection with Plaintiff's Section 1983
claim that his fraud claim must fail, at least for the reason that there is insufficient evidence in the
record to conclude that the School District Defendants knew or believed (prior to Holt sexually
abusing Plaintiff) that Holt was abusing and harassing Plaintiff (which would thereby render false
their implicit representation to the contrary).

Plaintiff relies on a Delaware Superior Court case to support his theory that holding an
employee out as trustworthy is tantamount to a fraudulent misrepresentation. *See McClure v.
Catholic Diocese of Wilmington, Inc.*, 2008 WL 495863 (Del. Super. Ct. Jan. 9, 2008).  In
*McClure*, however, the plaintiff produced evidence that the defendant Church "knew the priest
was abusing children and yet continued to hold him out to the community as an authority figure
worthy of trust." *Id.* at *2.  Here, as already noted, there is no evidence that the School District

39

Defendants knew Holt was sexually abusing Plaintiff until after she did so in late March 2006.

Accordingly, the Court will grant summary judgment to the School District Defendants on Plaintiff's fraud claim.

### 4. Breach of Fiduciary Duty

Finally, Plaintiff also alleges a novel theory of liability based on the "special relationship" between public school administrators and their students. Specifically, Plaintiff contends that the School District Defendants "owed fiduciary duties" to the District's students, including Plaintiff, duties which the School District Defendants "grossly breached." (D.I. 76 at 37) Both parties concede that this is an issue of first impression in Delaware. (*Id.* at 38; D.I. 70 at 34)

Little more need be said about Plaintiff's breach of fiduciary duty claim beyond the undisputed fact that Plaintiff can cite to no authority for recognizing this theory under Delaware law. This Court's task is to determine whether the Delaware Supreme Court would permit a breach of fiduciary duty claim to be pressed against members of a public school board and a public school district superintendent. *See generally DeWeerth v. Baldinger*, 38 F.3d 1266, 1273 (2d Cir. 1994) ("When confronted with an unsettled issue of state law, a federal court sitting in diversity must make its best effort to predict how the state courts would decide the issue."). Plaintiff provides no basis for predicting that the Delaware Supreme Court would accept Plaintiff's invitation to be the first state to recognize a fiduciary relationship between a public school district and its students.[25]

---

[25]The situation here is similar to that involved in *C.A. v. William S. Hart Union High Sch. Dist.*, 189 Cal. App. 4th 1166, 1176 (Cal. App. 2d Dist. 2010) ("[Plaintiff] does not cite, and we have not found, any authority stating that a fiduciary relationship exists between a school district and an individual student."). The Court could only find one case that even suggested that a school district owed fiduciary duties to its students. In *L.C. v. Cent. Pa. Youth Ballet*, 2010 U.S.

Delaware law defines a "fiduciary relationship . . . [as] a situation where one person reposes special trust in another or where a special duty exists on the part of one person to protect the interests of another." *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 113 (Del. 2006). Generally, only when a "relationship is of such a confidential or dependent nature" as to be considered a "close personal relationship of trust and dependency" will it "rise to fiduciary status." *Coleman v. Newborn*, 948 A.2d 422, 429-30 (Del. Ch. Nov. 27, 2007). Because a fiduciary relationship gives rise to "exacting standards," Delaware courts are "cautious when evaluating entreaties to expand the number and kinds of relationships that are denominated as 'fiduciary.'" *Bird's Const. v. Milton Equestrian Center*, 2001 WL 1528956, at * 4 (Del. Ch., Nov. 16, 2001). In order to obtain fiduciary status, something more than "an element of trust, as commonly understood" must be present. *McMahon v. New Castle Assocs.*, 532 A.2d 601, 604 (Del. Ch. 1987) (noting that patient-physician relationship is not fiduciary in nature).

Here, Plaintiff does not allege that there is a "confidential" relationship of any sort, nor does Plaintiff allege that there is a special relationship of dependency between him and the School District Defendants. While there may be, as Plaintiff contends, cases from other states that recognize a "special relationship" between public schools and their students (D.I. 76 at 38 n.27), none of these cases explicitly identify a fiduciary relationship, nor state that a student may pursue civil litigation for breach of such a fiduciary relationship.

The Court concludes that Delaware law does not recognize a fiduciary relationship between a public school district and its students. Consequently, the Court will grant summary

---

Dist. LEXIS 66060, at *17 (M.D. Pa. July 2, 2010), the court in a footnote stated, "[W]e believe that [the school] may have incurred a fiduciary duty." The court provided no basis or rationale for this statement.

41

judgment to the School District Defendants on Plaintiff's claim for breach of fiduciary duty.

## V.    CONCLUSION

For the foregoing reasons, the Court will grant the School District Defendants' motion for summary judgment with respect to all claims except for Plaintiff's state law claim for gross negligence. An appropriate order accompanies this Opinion.